**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **HEBBRONVILLE LONE STAR** | § | |
| **RENTALS, LLC, et al.** | § | |
| | § | |
| **v.** | § | **1:16-CV-856-RP** |
| | § | |
| **SUNBELT RENTALS INDUSTRIAL** | § | |
| **SERVICES, LLC** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:     THE HONORABLE ROBERT PITMAN
        UNITED STATES DISTRICT JUDGE

Before the Court are Plaintiffs' Motion for Vacatur (Dkt. No. 8); Defendant Sunbelt Rentals

Industrial Services, LLC's Response in Opposition to Plaintiffs' Motion (Dkt. No. 12);  and

Plaintiffs' Reply (Dkt. No. 13).  The District Court referred the above motion to the undersigned

Magistrate Judge for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(A), FED. R. CIV.

P. 72, and Rule 1(c) of Appendix C of the Local Rules.

**I. GENERAL BACKGROUND**

Hebbronville Lone Star Rentals, LLC and its owners Samuel and Leslie Lovett (collectively

"Lone Star") bring this suit against Sunbelt Rentals Industrial Services, LLC.  Lone Star moves to

partially vacate an arbitrator's award.  It challenges the award on the basis of 9 U.S.C. § 10(a)(4),

arguing that the arbitrator exceeded his powers.

**A.     Asset Purchase Agreement Terms**

This suit is based on an asset purchase agreement (Agreement) executed on August 1, 2014,

by which Sunbelt acquired the assets of Lone Star.  As part of the Agreement, Sunbelt agreed to pay

Lone Star, post-closing, three contingent payments, the details of which are set forth in Section 3.5

of the Agreement.  Only the first contingent payment is at issue here.  Whether a payment is due depends on whether receipts from certain pre-closing customers of Lone Star reach a specified level. The Agreement refers to these as "Business Customers" and lists them in Schedule 3.5(a)(iii) of the Agreement.  It refers to the target amount as the "Threshold" or "Contingent Payment Threshold." The Agreement provides that if Sunbelt's revenues from these customers for certain defined time periods meet or exceed the Threshold, then Lone Star is entitled to an additional payment from Sunbelt.  For the initial time period, the additional base payment is $7,000,000.  The Agreement further provides that if the revenues are less than 100%, but at least 90%, of the Threshold, then Lone Star is entitled to the $7,000,000 contingent payment, less two times the percentage difference below 100% that the revenues represent, times $7,000,000.  *See* Agreement § 3.5(d)(ii) (Dkt No. 9-1 at 16).  If, however, the revenues for the period are less than 90% of the Threshold, then no payment is due.  The Threshold is a sum certain set out in § 3.5(a)(ii) of the Agreement; for the first period it is $36,265,141.50.  Dkt. No. 9-1 at 14.[1]  Thus, for Lone Star to receive any additional payment for the initial period, Sunbelt's revenues from Business Customers would have to have been at least 90% of the Threshold, or $32,638,627.35.

Section 3.5 also addresses the resolution of disputes regarding Sunbelt's revenue calculations for each of the three contingent payments.  The process called for Sunbelt to provide Lone Star with its calculation of the revenue from Business Customers from the relevant period within 30 days of the end of that period.  Lone Star then had 30 days to decide whether it accepted the calculation.  If Lone Star "believe[d] such Revenue Calculation was not determined in accordance with this

---

[1]Because the first period was nine months instead of a year, the Threshold for that period is 75% of the figure for the second and third periods, which are both full year time frames.  The figure stated in the Agreement for those years is $48,353,522.

Agreement," it was to provide Sunbelt notice of its dispute in "reasonable detail," along with its proposed adjustments. Dkt. No. 9-1 at 15 (§ 3.5(b)). The parties were then to negotiate in good faith to resolve the dispute, but if those negotiations did not resolve all disputes within 20 days, Lone Star and Sunbelt were to "jointly select the Accounting Firm to resolve any remaining dispute over [Lone Star's] proposed adjustments." *Id.* The Agreement in a separate section provides that "[e]xcept for disputes resolved as set forth in Sections 3.3, 3.4, 3.5, and 3.6, the Parties hereby irrevocably submit to the exclusive jurisdiction of the federal or state courts of the State of Texas any Proceeding arising out of or relating to this Agreement or any of the Transactions. . . ." Dkt. No. 9-2 at 12.[2]

## B.    The First Contingent Payment

Shortly after the end of the first period, Sunbelt provided to Lone Star the revenue calculations for the first period. According to Sunbelt's calculations, Lone Star was $1.3 million short of 90% of the Threshold. Lone Star responded, stating it disagreed with Sunbelt's revenue calculations for two customers. With the first, COG Operating LLC (COG), Sunbelt had excluded a significant portion of the revenues because COG was listed under a different name on Sunbelt's accounts—COG Operating, LLC (the difference being the existence of a comma prior to "LLC"). Sunbelt argued that COG (with a comma) was not a Business Customer that should have been included in the revenue calculations. Alternatively, Sunbelt contended that because the pre-acquisition revenues from COG (with a comma) had not been included in the calculations leading to the parties' agreement on the Threshold, the post-acquisition revenues should similarly not be

---

[2]The other listed sections of the Agreement—3.3, 3.4 and 3.6—also deal with post-closing accounting adjustments, and each section contains a similar agreement to arbitrate or resolve those limited disputes with "the Accounting Firm." "Accounting Firm" is defined in § 3.3(b), as "an independent accounting firm which has not had a material relationship with Buyer, Seller or any of their respective Affiliates within 2 years preceding such selection." Dkt. No. 9-1 at 12.

included in the first period revenue calculations, regardless of whether it was the same customer. Lone Star disagreed, arguing that COG was a Business Customer, and under the plain language of the Agreement all of its revenues must be included in the first period revenue calculation. For the second implicated customer, BHP Billiton, Sunbelt had completely excluded its revenues from the calculation. Lone Star objected to this, as BHP had recently acquired Petrohawk Energy LLC, and Petrohawk was an identified Business Customer. Lone Star believed all of BHP's revenues should be included in the revenue calculation as Sunbelt had improperly attributed much of Petrohawk's revenues as belonging to BHP. Sunbelt disagreed, and in fact, during negotiations further reduced the revenues it attributed to Petrohawk.

Sunbelt and Lone Star were unable to agree on the calculation of the revenue derived from these two customers, and subsequently submitted the dispute to Dennis Neier of Anchin, Block & Anchin LLP, an accounting firm. The parties signed an engagement letter, which stated that the arbitrator was to resolve "their disagreement as to whether the threshold amount for the First Contingent Payment Period has been met, and if the threshold amount has been met, the amount of the First Contingent Payment." Dkt. No. 9-10 at 3. The letter further provided that no discovery would be permitted, "except for the production by [Sunbelt] to [Lone Star] of certain invoices in connection with whether the threshold amount . . . has been met," but that the parties were to provide all documents "reasonably requested" by the arbitrator. *Id.* at 8. The letter also stated that at any hearing only the arbitrator—and not the parties—would be permitted to ask questions. *Id.* at 9. The engagement letter noted that the arbitrator retained the "sole discretion" to engage independent legal counsel, but if he wished to be reimbursed for those costs, he was required to seek approval from the parties in advance of incurring such costs. *Id.* at 10.

4

C.      **The Arbitrator's Decision**

In a 98 page "Reasoned Decision and Award," the arbitrator found that Lone Star was not entitled to any sums for the First Contingent Payment.  The first part of the decision is unchallenged. Here, the arbitrator found that all the revenues from COG (both with and without a comma) and a percentage of the revenues from BHP/Petrohawk should have been included in the revenue calculation.  Both COG entities were found to be the same company and therefore a Business Customer and the revenues attributed to both were to be included in the revenue calculation.  With regard to BHP, the arbitrator found that it and Petrohawk were not the same company.  However, he agreed with Lone Star that Sunbelt had improperly attributed some of Petrohawk's (a Business Customer) revenues to BHP (not a Business Customer).  As it was difficult to determine the specific amount that should have been attributed to Petrohawk, the arbitrator decided that a percentage of BHP's revenues would be added to the revenue calculation.  With these two changes, the arbitrator determined that the total revenue from Business Customers for the first period was $34,820,837.22. Because this figure equates to 96% of the first period Threshold figure stated in the Agreement, had the decision ended here, Lone Star would have been entitled to a reduced Contingent Payment of $6,440,000 under Section 3.5(d)(ii).

However, the arbitrator did not end his decision here.  Sunbelt contended that the parties had made a mutual mistake when they calculated the Threshold amount.  Specifically, Sunbelt argued that the Threshold was intended to represent the pre-closing trailing twelve month revenues of the "Business Customers" listed in Schedule 3.5(a)(iii) of the Agreement, businesses that were customers of Lone Star before the acquisition.  Sunbelt contended that the Threshold was supposed to be the sum of Lone Star's revenues for all Business Customers, plus Sunbelt's pre-acquisition

5

revenues for the same customers, for the twelve months leading up to the closing.  Sunbelt argued that it and Lone Star mutually erred in calculating what the twelve month revenues for these customers had been, when they left out of the Threshold amount the parties' pre-closing revenues from COG (with a comma).  Had they included those revenues in the calculation, Sunbelt argued, the Threshold figure stated in the Agreement would have been significantly higher.  Relying on these facts, Sunbelt contended that the arbitrator should reform the Agreement to correct the error based on the mutual mistake doctrine under Texas law.

Lone Star objected to this, and objected to the arbitrator's power to even address the issue. Disagreeing, the arbitrator found that whether the Agreement should be reformed was within the scope of the dispute the parties agreed to arbitrate before him.  His reasoning was that "one of the 'remaining dispute[s]' under Section 3.5 of the Agreement is whether the Contingent Payment Threshold has been met.  That question necessarily turns on whether Section 3.5(a) . . . can be reformed due to mutual mistake of the Parties."  Dkt. No. 9-7 at 4.  After determining he had the power to decide Sunbelt's mutual mistake argument, the arbitrator moved to the merits and decided that the Agreement should be reformed.  He found that the parties made a mutual mistake in calculating the figure listed in the Agreement as the Contingent Payment Threshold.  Because he found the parties intended the Threshold to be the twelve-month trailing revenues of all the Business Customers, the revenues from COG (with a comma) should have been included in the calculation. He further found that the omission of those revenues was a mistake of both parties.  He thus reformed the Agreement reflecting this change, which increased the Threshold for the first period from the $36,265,141.50 stated in the Agreement to $39,606,349.  Using the figure he had earlier found to be the correct amount of Business Customer revenue for the first

6

period—$34,820,837.22—he concluded that the first period revenue represented only 88% of the reformed Threshold amount, and, therefore, Lone Star was not entitled to the any first Contingent Payment Amount.

Lone Star moves to vacate the award on two bases.  Lone Star argues that reformation of the agreement is outside the scope of the arbitration agreement, and thus this part of the decision should be vacated.  Second, Lone Star argues that even if the arbitrator had the power to reach the issue, he manifestly disregarded Texas contract law in finding that the parties had made a mutual mistake.

## II. LEGAL STANDARD

The Federal Arbitration Act (FAA) was enacted to codify "the national policy favoring arbitration and place[] arbitration agreements on equal footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).  Thus, a court's review of an arbitration award is limited.  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).  The FAA provides that a court may vacate an award:

(1)     where the award was procured by corruption, fraud, or undue means;

(2)     where there was evident partiality or corruption in the arbitrators, or either of them;

(3)     where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)     where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a);  *see also Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008) (holding that Sections 10 and 11 of the FAA are the exclusive methods to review an arbitration award).

7

On the other hand, "[j]udicial deference to arbitration . . . does not grant carte blanche approval to any decision an arbitrator might make." *Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Indep. Truck Drivers Union, Local No. 1*, 611 F.2d 580, 583 (5th Cir. 1980). "Arbitration is 'simply a matter of contract between the parties.'" *ConocoPhillips, Inc. v. Local 13-0555 United Steelworkers Int'l Union*, 741 F.3d 627, 630 (5th Cir. 2014) (quoting *First Options*, 514 U.S. at 943). "[A] party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration." *First Options*, 514 U.S. at 945. The arbitrator "can bind the parties only on issues that they have agreed to submit to him." *Piggly Wiggly*, 611 F.2d at 583. Thus, "[i]f an arbitral panel exceeds its authority, it provides grounds for a court to vacate that aspect of its decision." *Smith v. Transp. Workers Union of Am., AFL-CIO Air Transp. Local 556*, 374 F.3d 372, 375 (5th Cir. 2004).

### III. ANALYSIS

There are three questions this Court must address. The first is whether the parties agreed to have the arbitrator resolve disputes about what was and was not arbitrable, or whether that is the Court's role. If the answer is the parties submitted that question to the arbitrator, then the only remaining question is whether the arbitrator manifestly disregarded the law. However, if the parties did not agree to have the arbitrator resolve the scope of his powers, then the Court must decide whether the mutual mistake claim was one of the disputes the parties agreed to arbitrate. Finally, if the Court concludes that the parties agreed to arbitrate the mutual mistake claim, then it must decide whether the arbitrator manifestly disregarded the law in reaching his conclusion.

A.      **Intent to Arbitrate Arbitrability**

The first question is "who has the power to decide whether an issue is arbitrable." *ConocoPhillips*, 741 F.3d at 630.  There is a general presumption that issues of arbitrability are for a court, not an arbitrator, to resolve.  *See First Options*, 514 U.S. at 944-45 (1995).  Thus, only where there is clear and unmistakable evidence that the parties intended to submit the issue of arbitrability to the arbitrator must the court defer to the arbitrator on that issue.  *Id.* at 944.  If the arbitrability question was properly before the arbitrator, then the court is bound by the arbitrator's decision.  *Id.* at 943.   On the other hand, if the arbitrator improperly decided it had the power to decide that question, the court should decide it "just as it would decide any other question that the parties did not submit to arbitration, namely, independently."  *ConocoPhillips*, 741 F.3d at 630-31 (quoting *First Options*, 514 U.S. at 943).  The party contending that the parties agreed to arbitrate the issue "bear[s] the burden of demonstrating clearly and unmistakably that the parties agreed to have the arbitrator decide that threshold question of arbitrability."  *Id.* (quoting *Gen. Motors Corp. v. Pamela Equities Corp.*, 146 F.3d 242, 249 (5th Cir. 1998)).   Thus, the burden on this question is on Sunbelt.

There is not clear and unmistakable evidence here that the parties intended to have the arbitrator decide the scope of the arbitration.  First, the clause delegating matters does nothing to suggest that this power was given to the arbitrator.  It provides for the arbitrator to "resolve any remaining disputes over [Lone Star's] proposed adjustments" to the revenue calculations.  Other than three very similar clauses, addressing very similar accounting disputes, the parties agreed that all other disputes under the Agreement were to be resolved in the courts.  Thus, the arbitration clause itself reflects the opposite of "clear and unmistakable evidence" that the parties delegated

arbitrability to the arbitrator—rather, it suggests that they did *not* agree to allow an arbitrator to decide anything other than certain accounting issues.

Sunbelt's sole argument to the contrary is that because Lone Star "expressly authorized the Arbitrator to 'retain outside Texas legal counsel with respect to . . . the right of the Arbitrator to reform the Asset Purchase Agreement and/or Schedule 3.5(a)(iii),'" it "agreed to have the Arbitrator decide whether Sunbelt's reformation request was arbitrable." Dkt. No. 12 at 19 (quoting engagement letter). Sunbelt's depiction of these events stretches what actually happened. As noted earlier, the arbitrator did not have to seek either party's permission to retain outside legal assistance. Instead, the parties' advance authorization was only required if the arbitrator wished to be *reimbursed* for the costs of that legal assistance. Dkt. No. 9-10 at 10. So when Lone Star consented to the arbitrator retaining counsel it was only agreeing to reimburse him for half of the legal fees he incurred in doing so. And as Lone Star points out, it had little practical choice in the matter:

> Lone Star agreed to reimburse the Accountant for these costs, as it would be strategically imprudent to do otherwise (i.e. how could a party ensure unbiased treatment if it forced the decisionmaker to pay $7,000 out of his own pocket). Additionally, in the engagement letter, Lone Star agreed that it would not "unreasonably withh[o]ld, condition[ ] or delay[ ]" giving its consent for the Accountant to incur fees and costs, and, if Lone Star refused to pay any fee or expense, the Accountant could refuse to give Lone Star his Reasoned Decision and Award.

Dkt. No. 12 at 6. *See also* Dkt. No. 9-10 at 6, 8-9. Lone Star objected to the arbitrator deciding the scope issue from the start. *See, e.g.* Dkt. No. 9-11 at 13-14. And even though it continued to participate in the proceedings, Lone Star did so subject to its objection to the arbitrator deciding either the arbitrability issue, or the mutual mistake claim. A party does not waive their rights

"merely arguing the arbitrability issue to an arbitrator." *Id.* at 631.   Also, "ambiguity and silence favor having that question decided by the court, not the arbitrator." *Id.* at 632.

Sunbelt contends that Lone Star went further, and also argued the merits of the mutual mistake issue before the arbitrator, and that this is fatal to Lone Star's argument.   But in *ConocoPhillips*, the Fifth Circuit found that even participation in the merits of the dispute—after objecting to arbitrability—did not waive the party's objection.  741 F.3d at 632.  Instead, the Fifth Circuit found that the most important issue was whether the party had objected to arbitrability.  *See id.* at 633 (distinguishing a Fourth Circuit and Sixth Circuit case on the basis that the parties in those cases had failed to object to arbitrability).   The court even noted that it was "prudent" for the objecting party to address the merits, so that in the event the party lost its argument on arbitrability it would not have waived its claims or defenses at the arbitration.  *Id.* at 632.  As in *ConocoPhillips*, Lone Star participated in the decision on the merits only after objecting to the arbitrability of the dispute.  Thus, Lone Star's participation is not clear and unmistakable evidence that it intended to submit the arbitrability issue to the arbitrator.

The parties' agreement is clear on the scope of the arbitrator's powers, which are quite limited.  Those powers were limited to resolving disputes over specific calculations called for in four discrete sections of the Agreement.  The limited nature of the arbitration clause, along with its clear language, combined with the presumption that whether an issue is arbitrable will be determined by the courts, means that Lone Star is correct on this point.  The arbitrator erred when he decided he had the power to determine if Sunbelt's mutual mistake claim was within the scope of his powers granted under § 3.5 of the Agreement.  Instead, that was an issue the parties agreed to leave to the courts.

**B.      Scope of the Arbitration Agreement**

This means that the Court must decide independently whether Sunbelt's claim of mutual mistake is a dispute within the scope of the arbitration clause contained in § 3.5.  *See id.* at 634 ("Having found that the parties vested power to decide arbitrability in the courts, the district court then had to determine whether the dispute was arbitrable . . . ."). To decide whether an issue is arbitrable, there are "two considerations:  (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Webb v. Investacorp, Inc.*, 89 F.3d 252, 58 (5th Cir. 1996).  Here, neither party disputes that a valid arbitration clause exists.  They do, however, disagree as to the scope of that clause.

On this question, the presumption is reversed.  Where there is a valid arbitration clause, "there is a presumption of arbitrability." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).  The court must resolve all doubts concerning the arbitrability of claims in favor of arbitration.  *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).  Thus, "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," the court should find in favor of arbitration.  *AT&T Techs.*, 475 U.S. at 650.  However, this presumption does not "override the clear intent of the parties;" nor should the courts "reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).

The first step is identifying clearly what documents make up the parties' arbitration agreement.  No one disputes that the primary terms of the agreement are set out on § 3.5 of the

Agreement.  Further it appears that both parties also agree that the terms of the engagement letter supplement the agreement, and the Court is also to look to that document in defining the scope of the parties' agreement to arbitrate.  The Fifth Circuit has held that in determining whether a dispute is subject to arbitration, a court may look to both the parties' contract, and to engagement agreements with an arbitrator.  *Piggly Wiggly*, 611 F.2d at 584 (a court "must look both to their contract and to the submission of the issue to the arbitrator to determine his authority")

The parties' views of the engagement letter, however, diverge when it comes to the impact the letter has on the question of the scope of the arbitration agreement.  The engagement letter states that the arbitrator:

> understand[s] that pursuant to Section 3.5 of the Agreement, the Parties are submitting to the Arbitrator, for resolution, their disagreement as to whether the threshold amount for the first Contingent Payment Period has been met, and, if the threshold amount has been met, the amount of the First Contingent Payment.

Dkt. No. 9-10 at 3.  Sunbelt contends that this language is broader than that in § 3.5, mainly because the letter uses "threshold" rather than "Threshold."  Sunbelt contends this reflects that the letter is not referring to the specific Threshold figure stated in Section 3.5(a)(ii).  According to Sunbelt, if the term does not refer specifically to the number set forth in the Agreement, then the arbitrator was free to determine what the threshold should be before determining whether it had been met.  The Court finds this unpersuasive.  The engagement letter uses the phrase "threshold amount for the first Contingent Payment Period."  It further explicitly states that the parties were submitting the dispute "pursuant to Section 3.5 of the Agreement."  Given what § 3.5 says, there is no reasonable way to interpret "threshold" in the engagement letter as meaning anything other than what § 3.5 refers to as the "Contingent Payment Threshold," and which provides that "for purposes of the first

Contingent Payment Period, the Contingent Payment Threshold will be $36,265,141.50." Dkt. No. 9-1 at 14, § 3.5(a)(ii).  Notwithstanding Sunbelt's claim, nowhere in the engagement letter do the parties request the arbitrator to "determine the amount of the threshold itself."  And this makes perfect sense when the parties had already stated in § 3.5 precisely what that amount was.  In sum, the Court does not believe anything in the engagement letter expands the scope of the arbitration beyond that which is set forth in § 3.5.  This is not to say that the engagement letter is irrelevant.  To the contrary, as will be seen below, its terms provide insight into the parties' intentions regarding the scope of the agreement to arbitrate.

Having defined the makeup of the parties' agreement, the Court begins its analysis with the language of the contract. The arbitration clause in § 3.5 of the Agreement, as noted previously, is quite limited, and makes up only a small fraction of § 3.5.  Section 3.5 itself is titled "Contingent Payment Amount," and addresses in detail such topics as how post-acquisition revenues will be calculated to determine if a set "Threshold" is met, which customers' revenues are to be counted, and what the contingent payment amount shall be depending upon what percentage of the Threshold amount is received.  Arbitration is only mentioned in § 3.5 when it describes the process for determining if a contingent payment is due.  The process starts with Sunbelt providing Lone Star with Sunbelt's calculation of the revenue for the relevant period from Business Customers (listed in a schedule attached to the Agreement).  Lone Star then has 30 days to assess the calculation.  If Lone Star "believes such Revenue Calculation was not determined in accordance with this Agreement," it is to provide Sunbelt notice of its dispute in "reasonable detail," along with its proposed adjustments. Dkt. No. 9-1 at 15 (§ 3.5(b)). The parties agree to then negotiate in good faith to resolve "any disputes over Sellers proposed adjustments to a Revenue Calculation," but if those

14

negotiations fail, Lone Star and Sunbelt agree to "jointly select the Accounting Firm to resolve any remaining dispute over Seller's proposed adjustments." *Id.* at § 3.5(c).  The Agreement provides that Sunbelt "shall provide the Accounting Firm with access to the Books and Records of the Buyer Business necessary to enable the Accounting Firm to complete its assignment." *Id.*  There is no other mention of the materials to be provided to the arbitrator.

The arbitrator (and Sunbelt) seized on the "any remaining dispute" language to justify ruling on Sunbelt's mutual mistake claim.  In the arbitrator's words:

> The Agreement provides that if the Buyer and the Seller cannot resolve any dispute over the Seller's proposed adjustments to a Revenue Calculation, the Buyer and the Seller "jointly will select the Accounting Firm to resolve **any remaining dispute** over Seller's proposed adjustments in accordance with this Agreement . . . ." See Agreement, at § 3.5(c) (emphasis added). The Engagement Letter agreed to by the Parties echoes this, stating that "the Parties are submitting to the Arbitrator, for resolution, their disagreement as to whether the threshold amount for the first Contingent Payment Period has been met, and, if the threshold amount has been met, the amount of the First Contingent Payment."
>
> Here, one of the "remaining dispute[s]" under Section 3.5 of the Agreement is whether the Contingent Payment Threshold has been met. That question necessarily turns on whether Section 3.5(a) and Schedule 3.5(a)(iii) can be reformed due to mutual mistake of the Parties to include the trailing twelve month Revenue of COG Operating, LLC in the amount of the Contingent Payment Threshold.  Thus, the Arbitrator finds that both the Agreement and the Engagement Letter give the Arbitrator the authority to resolve this [mutual mistake] issue of dispute.

Dkt. No. 1-4 at 90-91. This conclusion however, is inconsistent with the language of § 3.5, and takes "any remaining dispute" out of context.  It was not simply "any remaining dispute" that the parties agreed to arbitrate.  Rather, it was "any remaining dispute *over Seller's [Lone Star's] proposed adjustments*."  And the term is actually further refined earlier in the sentence in which it appears.  The full sentence reads:

Buyer and Seller will negotiate in good faith to resolve *any dispute over Seller's proposed adjustments to a Revenue Calculation*, provided that if any such dispute is not resolved within twenty (20) days following receipt by Buyer of the proposed adjustments, Buyer and Seller jointly will select the Accounting Firm to resolve any remaining dispute over Seller's proposed adjustments in accordance with this Agreement, which resolution will be final; provided, however, the Accounting Firm will not be entitled to resolve any dispute regarding the existence of New Customers or Growth Customers.

Dkt. No. 9-1 at 15-16 (emphasis added). Thus, the "disputes" this sentence refers to are "any dispute over [Lone Star's] proposed adjustments to a Revenue Calculation." "Revenue Calculation" is a defined term, meaning "a statement setting forth in reasonable detail the Revenues for such Contingent Payment Period." *Id.* at 15 § 3.5(b). So to spell it out fully, the defined language of the Agreement provides that arbitrable disputes are **disputes over Lone Star's proposed adjustment to Sunbelt's statement of Revenues for the first Contingent Payment Period**. Sunbelt's mutual mistake claim is quite clearly not a dispute over whether Lone Star had properly calculated the revenues of all of the Business Customers, and had properly adjusted Sunbelt's revenue figures. It is a dispute over whether the first period Threshold figure set out in the agreement—a sum certain—was calculated correctly, or instead was the result of a mistake made by both parties to the contract.

Many other aspects of the Agreement corroborate this. For example, and as just mentioned, the applicable threshold figure is a sum certain: "for purposes of the first Contingent Payment Period, *the Contingent Payment Threshold will be $36,265,141.50*." *Id.* at § 3.5(a)(ii) (emphasis added). Thus, the Agreement does not require any calculations to determine what the Threshold figure is. The Agreement sets it out to the penny, literally. To reach the conclusion the arbitrator did, one must assume that the parties envisioned that they might have a dispute regarding what the

16

Threshold amount was.  That assumption, however, is completely inconsistent with the plain language of the Agreement, since the parties stated an exact, agreed-upon figure for the Threshold. Sunbelt attempts to make the same argument when it asserts that because Lone Star agreed that the arbitrator was empowered to decide whether the threshold amount had been met, this "necessarily required the arbitrator to determine the amount of the threshold itself." Dkt. No. 12 at 12.  But this again ignores the fact that the parties had already agreed on the threshold amount and set it out in the Agreement.   When the threshold amount is a set number, the only reasonable interpretation of the Agreement (and the engagement letter) stating that the arbitrator is to decide "whether the threshold amount was met," is that the parties were agreeing to have him resolve any disputes regarding which revenues qualified to be counted, and whether they totaled at least 90% of $36,265,141.50.[3]

Another feature of the Agreement that confirms this conclusion is the very identity of the arbitrator.  As noted earlier, the parties agreed that the arbitrator would be "an independent accounting firm which has not had a material relationship with Buyer, Seller or any of their respective Affiliates within 2 years preceding such selection."  Dkt. No. 9-1 at 12.  Both parties to the Agreement were sophisticated businesses.  Had they been agreeing to arbitrate technical legal issues such as mutual mistake, it is unlikely they would have chosen an accountant to arbitrate those issues.  Rather, the fact that they contracted for an accountant to be the arbitrator is consistent with Lone Star's position that the only issues reserved for arbitration were accounting issues, not legal

---

[3]The arbitrator's decision evidences that there were in fact many disputes that could arise regarding whether certain revenues qualified.  For example, pages and pages of his decision are dedicated to resolving the dispute regarding Petrohawk and BHP revenues, as well as the dispute about whether revenues from COG (with a comma) and COG (no comma) both qualified.

ones.  Numerous courts have relied on this very same aspect of an arbitration agreement to reach the same conclusion.[4]

This inference is further bolstered by the fact that the arbitration clause is limited to one section of the Agreement—§ 3.5—and the only other arbitration clauses in the Agreement are found in sections nearly identically to § 3.5—§§ 3.3, 3.4, and 3.6.  Like § 3.5, these clauses set out post-acquisition accounting responsibilities of the parties, and provide for arbitration of disputes.[5]  The inclusion of arbitration clauses in only these four sections, combined with the default dispute resolution clause calling for court litigation, creates a strong inference that the parties intended only to arbitrate disputes on the limited accounting issues called for in these sections of their Agreement, and intended to litigate all other issues.

The process agreed to for the arbitration proceedings also confirms this.  The parties agreed that there would be no discovery, and that the only records that were to be provided to the arbitrator were accounting records and invoices. Dkt. No. 9-10 at 8.  In the engagement letter they also sharply circumscribed the hearing:

> it is anticipated that the entire dispute resolution process will be accomplished by the initial Scheduling Conference Call and two written submissions by the Parties, one

---

[4]*See, e.g.*, *Fit Tech, Inc. v. Bally Total Fitness Holdings*, 374 F.3d 1, 8-9 (1st Cir. 2004); *Hodges v. Medassets Net Revenue Sys., LLC*, 2008 WL 476140, *4-5 (N.D. Ga. Feb. 19, 2008); *Harker's Distrib., Inc. v. Reinhart Foodservice LLC*, 597 F. Supp. 2d 926, 940 (N.D. Iowa 2009); *Blutt v. Integrated Health Servs., Inc.*, 1996 WL 389292 (S.D.N.Y. July 11, 1996); *Powderly v. MetraByte Corp.*, 866 F.Supp. 39 (D. Mass.1994); *United Steelworkers of Am. v. Nat'l Roll Co.*, 1990 WL 10043689 (W.D. Pa. May 3, 1990).

[5] Section 3.3 provides for arbitration of "any dispute over Seller's proposed adjustments to Buyer's Closing Computations." Dkt. No. 9-1 at 12.  Section 3.4 provides for arbitration "of any dispute over Seller's proposed adjustments to the [Closing Date Accounts Receivable and the Earned Not Billed Revenues]."  *Id.* at 13.  Finally, Section 3.6 provides for arbitration to "finalize the allocation of the Purchase Price among the Acquired Assets."  *Id.* at 17.

initial submission and one reply submission. It is also anticipated that the Arbitrator will, after the submission of the Parties' Reply Submissions, submit questions and/or a request for additional documents to the Parties. The Arbitrator will, in his absolute discretion, determine if there is a need for one hearing at which the Arbitrator can ask the Parties for any clarification of anything in the Parties' submissions, or in furtherance of the written questions furnished by the Arbitrator to the Parties. Such a hearing, if any, will be in person. All of the questioning at any such hearing shall be performed solely by the Arbitrator and none of the Parties shall be permitted to question or cross examine any of the other Parties or their representatives; provided that, at least three (3) Business Days prior to any such hearing, each Party may submit concurrently to the Arbitrator and the other Parties questions it desires to be asked at such hearing by the Arbitrator and the Arbitrator may (but shall not be obligated to) ask any of the questions at such hearing that are properly submitted to the Arbitrator hereunder.

*Id.* at 9. A hearing that permits no discovery, no evidence, no witnesses, and not even questioning by counsel, is inconsistent with the parties having agreed to submit a fact-intensive, legally complex issue like mutual mistake to the arbitrator. A hearing without evidence and witnesses, however, makes sense when the arbitrator is an accountant, and the arbitration agreement only extends to accounting disputes.

Sunbelt relies heavily on the presumption in favor of arbitration. It contends that taking a broad view of the phrase "any remaining dispute," as the arbitrator did, is a reasonable interpretation of the arbitration clause, and one that covers the mistake claim. Relying on *AT&T Techs.*, it contends this means the Court must apply the presumption and find that the mistake claim was arbitrable. The Supreme Court, however, has warned about using the presumption of arbitrability as a way to ignore the plain language of a contract. It has cautioned that the presumption cannot "override the clear intent of the parties," and that a court would be applying the presumption incorrectly if it were to "reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 379, 294 (2002). The question

is whether "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs.*, 475 U.S. at 650. And for the reasons just set out, this is the very case in which such a "positive assurance" is possible. The construction of the arbitration clause Sunbelt advocates is too much at odds with the Agreement for even the policy favoring arbitration to allow it.

Though there are no Fifth Circuit cases with facts close to those here, two cases from the Sixth Circuit provide helpful instruction on the proper result in this case. Sunbelt relies on one of those cases—*PureWorks, Inc. v. Unique Software Solutions, Inc.*, 554 F. App'x 376 (6th Cir. 2014)—in support of its position, while Lone Star points to the other—*Bratt Enterprises, Inc. v. Noble International Ltd.*, 338 F.3d 609 (6th Cir. 2003). Like this case, both of these cases involved asset purchase agreements, In *PureWorks*, the agreement called for the buyer to provide regular "earn-out reports" to the seller. The "earn-outs" were payments due to the seller, and were linked to the revenues of the new business after closing. The parties agreed that "dispute[s] with respect to earn-out reports" were to be sent to an accounting firm for arbitration. The question that arose in *PureWorks* was whether that agreement encompassed disputes the court referred to as "operational"—disputes relating to the performance of the contract—or whether it only applied to accounting disputes. 554 F. App'x at 378. The court found that "operational disagreements affecting the earn-out report—including disputes about performance of the earn-out covenants—qualified as disputes regarding the earn-out report" because those disputes "concern and affect the numbers that were included in the earn-out report, and thus are, or at least arguably are, 'disputes regarding the earn-out report.'" *Id.* at 378, 380.

*Bratt Enterprises* also involved a dispute arising from an asset purchase agreement.  In that case, the buyer only assumed the seller's accounts payable up to $1.2 million, meaning that the seller remained liable for any accounts payable above that sum, and limited the buyer's liability for accounts receivable to $1.2 million.  The parties agreed to make post-closing adjustments to the purchase price to more accurately reflect the closing-day values.  They accomplished this with the submission by the buyer of a "Closing Balance Sheet," which was to include any adjustments the buyer believed were necessary.  338 F.3d at 611. The agreement further provided:

> Seller will notify Buyer as to whether it disagrees with any of the amounts included in the Closing Balance Sheet . . . . If the parties are unable to resolve their differences within 60 days of their receipt of the Closing Balance Sheet, Seller and Buyer agree to retain a national accounting firm . . . to arbitrate the dispute. . . .

*Id.* at 612.  Two disputes arose, one regarding whether the Closing Balance Sheet correctly valued the accounts payable, and the other regarding whether the $1.2 million limit on liability for accounts payable was the result of a mutual mistake.  *Id.* at 613.  Relying on the plain language of the contract, the court found that the correct valuation of the accounts payable, a set figure contained in the Closing Balance Sheet, was squarely within the scope of the arbitration agreement.  *Id.*  On the other hand, it held that the claim that the $1.2 million figure stated in the agreement itself was the result of a mistake, was not arbitrable because that claim "does not itself involve a disagree[ment] with any of the amounts included in the Closing Balance Sheet."  *Id.*  Instead, "it involve[d] a determination of whether the parties' intent regarding . . . retained liabilities was based upon the parties' sharing a misunderstanding about an essential term of their agreement."  *Id.*  The court also rejected the assertion that the policy favoring arbitration required it to broadly construe the parties' agreement in favor of arbitration, because "there [was] no ambiguity regarding the scope of the arbitration

agreement. The parties only agreed to arbitrate disagreements about the amounts reflected on the closing balance sheet," and the FAA "requires that parties only be compelled to arbitrate matters within the scope of their agreement." *Id.* (*citing Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 221 (1985)).

As is obvious, the facts of this case are much more akin to those in *Bratt Enterprises*. In *Bratt* the parties only agreed to arbitrate disputes over the amounts set out in the Closing Balance Sheet, and here Sunbelt and Lone Star agreed to arbitrate disagreements "regarding [Lone Star's] proposed adjustments" to customer revenue calculations. Additionally, both this case and *Bratt* involved a claim related to their accounting dispute over whether a specific monetary figure stated in the parties' agreement was the result of a mutual mistake. In *Bratt*, it related to the limitation on the seller's liability for accounts payable, and here it involves whether the Threshold figure was correctly stated. The *Bratt* court concluded that because reforming the $1.2 million figure would not change the valuation of the accounts payable set out in the Closing Balance Sheet, the mutual mistake claim was not arbitrable, because the parties only agreed to arbitrate disputes involving the Closing Balance Sheet. The same is the case here. Reforming the contract to change the Threshold figure will not change which Business Customer Revenues are supposed to be included in the Revenue Calculation. Business Customers are specifically listed in Schedule 3.5(a)(iii), and "revenues" are defined in the Agreement. And while the engagement letter specifically provided that the arbitrator would determine if the Threshold had been met, it also stated that he was to make this decision "in accordance with" the Agreement. Dkt. No. 9-10 at 3. The arbitrator in fact resolved the question of whether Lone Star's proposed adjustments to Sunbelt's Revenue Calculation were

accurate without reaching the mutual mistake issue.  *Bratt*'s facts are almost identical to those here, and for the reasons articulated by the Sixth Circuit in that case, the result here should be the same.[6]

Here, "there is no ambiguity regarding the scope of the arbitration agreement," and the presumption in favor of arbitrability does not change this analysis.  *Bratt Enterprises*, 338 F.3d at 613. As the plain language of the arbitration clause and engagement letter do not support the arbitrability of Sunbelt's request to reform the Agreement, the arbitrator exceeded his powers when he decided Sunbelt's claim of mutual mistake.  The arbitration award on the mutual mistake question should therefore be vacated.  Finally, because the Court is recommending partial vacatur, there is no need to address Lone Star's claim for manifest disregard.

## IV. RECOMMENDATION

The undersigned therefore RECOMMENDS the District Judge GRANT Plaintiffs' Motion for Vacatur (Dkt. No. 8) and vacate the portion of the arbitration award reforming the Agreement based on mutual mistake.

## V. WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections. *Battles v. United States Parole Comm'n,* 834 F.2d 419, 421 (5th Cir. 1987).

---

[6]At least one other court has come to the same conclusion regarding a mutual mistake claim. That case also involved an accountant-arbitrator, and the dispute was about which post-closing customer revenues should be included in a revenue calculation.  *Harker's Distrib., Inc. v. Reinhart Foodservice LLC*, 597 F. Supp. 2d 926, 939-40 (N.D. Iowa 2009).

23

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *See* 28 U.S.C. § 636(b)(1)(C);  *Thomas v. Arn*, 474 U.S. 140 (1985);  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 15th day of March, 2017.


_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE